PAPER MACHINERY CORPORATION, Plaintiff-Respondent and Cross-Respondent,

v.

NELSON FOUNDRY COMPANY, INC., Defendant and Third-Party Plaintiff-Respondent and Cross-Appellant,

ROYAL GLOBE INSURANCE COMPANY, Third-Party Defendant-Appellant.†

Court of Appeals

*No. 81–2076. Submitted on briefs June 16, 1982.—*
*Decided July 23, 1982.*
(Also reported in 323 N.W.2d 160.)

† Petition to review denied. BEILFUSS, C.J., and STEINMETZ, J., took no part.

615

For the appellant-third-party defendant the cause was submitted on the briefs of *Cook & Franke, S.C.* and *Robert L. Elliott*, of counsel, of Milwaukee.

For the plaintiff-respondent and cross-respondent the cause was submitted on the brief of *Rubin and Laufer, S.C.*, by *Harold A. Laufer*, and *David E. Beckwith* and *Michael A. Bowen*, of *Foley & Lardner*, of counsel, all of Milwaukee.

For defendant and third-party plaintiff-respondent and cross-appellant the cause was submitted on the brief of *David J. Cannon* and *Carl K. Trimble* of *Michael, Best & Friedrich*, of Milwaukee.

Before Decker, C.J., Moser, P.J., and Randa, J.

DECKER, C.J. This appeal from a judgment awarding damages for breach of warranty and from an amended judgment raises issues of insurance coverage and alleged trial error. Because we conclude that there is insurance coverage and find no reversible error at trial, we affirm.

Nelson Foundry Company, Inc. (Nelson) purchased from Royal Globe Insurance Company (Royal Globe) Comprehensive General Liability Insurance for the years 1972–73, 1973–74, and 1974–75. During this period, Nelson manufactured cast aluminum alloy mandrels for Paper Machinery Corporation (Paper Machinery). Paper

Machinery incorporated the mandrels into paper cup making machines which it sold to customers throughout the world.

In 1975, the mandrels began cracking while in use, and Paper Machinery replaced the mandrels as they broke, initially at the customer's expense, and ultimately at its own expense when the problem became widespread. Analysis of the broken mandrels showed that the aluminum used was not the alloy specified by Paper Machinery, and that the casting was unacceptably porous.

Paper Machinery sued Nelson for the cost of investigation of the damage to the mandrels, repair and replacement of the mandrels,[1] lost profits, and damage to good will. Nelson impleaded Royal Globe, and Royal Globe defended itself and Nelson at trial. The jury found that Nelson had breached warranties given to Paper Machinery Corporation, and awarded $846,841.60 damages. The trial court entered judgment against Nelson and Royal Globe jointly and severally, and later amended judgment to confine Royal Globe's liability to its policy limits.

Royal Globe appeals from the original judgment and the amended judgment, raising the following issues:

(1) Paper Machinery's claim is excluded from coverage by the "sistership" exclusion in the policies;

(2) Paper Machinery's claim does not constitute "property damage" covered by the policies;

(3) The trial court erroneously allowed into evidence hearsay complaints of Paper Machinery customers;

(4) Paper Machinery surprised and unfairly prejudiced the defense by using an expert witness not named before trial;

---

[1] The trial court determined on pretrial motions that the exclusions of the Royal Globe insurance policies did not apply to lost profits, damage to good will, or investigation costs. Whether repair and replacement costs should have been covered is not contested on appeal by any aggrieved party.

(5) The expert's testimony was based on excluded hearsay testimony and therefore had no foundation;

(6) The expert's testimony that Paper Machinery's loss of future profits was due to mandrel failures is too speculative to sustain the verdict;

(7) The trial court erred when it refused to include a causation question in the special verdict; and

(8) The trial court should have struck a juror who disclosed during trial that she knew members of the family of Paper Machinery's president.

Nelson cross-appeals, arguing that the trial court erred when it failed to grant a continuance so Nelson could implead another insurer.

We find no reversible error and affirm.

## SISTERSHIP EXCLUSION

Royal Globe contends that its policies do not cover any of the claims made by Paper Machinery against Nelson because the facts of this case fall squarely within the following exclusion, which appears in all three policies:

This insurance does not apply:

. . .

to damages claimed for the withdrawal, inspection, repair, replacement, or loss of use of the named insured's products or work completed by or for the named insured or of any property of which such products or work form a part, if such products, work or property are withdrawn from the market or from use because of any known or suspected defect or deficiency therein.

We reject this contention, and conclude that the exclusion has no application to the facts of this case.

Generally, the construction of an insurance policy is a question of law to be redetermined independently on appeal. *Kraemer Bros. v. United States Fire Insurance Co.*, 89 Wis. 2d 555, 562, 278 N.W.2d 857, 860 (1979).

Our objective in interpreting and construing an insurance contract is to "ascertain and carry out the intention of the parties." *Herwig v. Enerson & Eggen*, 98 Wis. 2d 38, 39, 295 N.W.2d 201, 203 (Ct. App. 1980), which must be determined "from the four corners of the insurance policy itself." *Stanhope v. Brown County*, 90 Wis. 2d 823, 848, 280 N.W.2d 711, 721 (1979). In so doing, the policy must be considered as a whole to give reasonable meaning to every provision. *Id.* at 848–49, 280 N.W.2d at 722.

Analyzing the exclusion on which Royal Globe relies, it is clear that Paper Machinery has claimed and been awarded "damages . . . for the . . . replacement . . . of the named insured's [Nelson's] products." By the plain meaning of the exclusion, however, such damages are excluded from coverage only if the insured's products "are withdrawn from the market or from use because of any known or suspected defect or deficiency therein." That is not the situation in this case. Paper Machinery never withdrew the defective mandrels from the market because of known or suspected defect. It replaced customer's mandrels only if and when they broke. We reject Royal Globe's characterization of this replacement as a recall or withdrawal of the mandrels from the market. There is no evidence in the record that Paper Machinery ever contacted any of its customers and advised them of its replacement policy or of suspected defects, or otherwise initiated the replacement of defective mandrels. Paper Machinery merely replaced mandrels when informed *of breakage* in the field. This does not constitute a withdrawal from the market by it, but a mere honoring of warranty obligations if and when defects became known.

Although we need not resort to construction or case law to bolster the plain meaning of this provision, *Garriguenc v. Love*, 67 Wis. 2d 130, 135, 226 N.W.2d 414,

417 (1975), we note that the plain meaning we have attributed to this exclusion is supported by substantial authority interpreting the identical exclusion.

This provision first appeared in the insurance industry in 1966 as part of the new Standard Provisions for General Liability Insurance formulated by the National Bureau of Casualty Underwriters and the Mutual Insurance Rating Bureau. 3 R. Long, *The Law of Liability Insurance* App B, sec 1 (1981).[2] It is commonly called the "sistership" exclusion, and

denies coverage for claims based on the cost of withdrawing a product from the market, replacing a product or the loss of use of a product which is temporarily or permanently withdrawn from the market because of occurrences involving the same or a similar product. The name derives from an occurrence in the aircraft industry where all airplanes of a certain make and type were grounded by an order of the Civil Aeronautics Administration because one crashed and others were suspected of having a common structural defect. The damages arising out of the loss of use of all the sister ships were enormous.

The recall of equipment or parts discovered to have a common fault involve expenses incurred to prevent accidents which have not occurred. While the insurance covers damages for bodily injuries and property damage caused by the product that failed, it was never intended that the insurer would be saddled with the cost of preventing other failures, any more than it was intended that the insurer would pay the cost of preventing the first failure if the product had been discovered to be in a dangerous condition before the occurrence. *Id.* sec. 15.

*See also* Shipman, *Products Liability Insurance, Part I,* 6 For The Defense 61, 61–62 (October, 1965).

---

[2] These provisions were revised in 1973, but the exclusion in question was unchanged except that its letter designation was changed due to the inclusion in the standard provisions of two new exclusions. A. Reichenberger, *The General Liability Insurance Policies—Analysis of 1973 Revisions* 17 (DRI Monograph, Jan. 1974).

Other courts which have interpreted this exclusion have attributed the same meaning to it. *See, e.g., Wyoming Sawmills v. Transportation Insurance Co.,* 578 P.2d 1253, 1257 (Or. 1978) :

Exclusion (p) precludes losses based upon the *withdrawal from the market of a product* which is expected to be or is found to be defective. It is known as the "sistership" exclusion. It is intended to exclude from coverage the cost of preventative or curative action by withdrawal of a product in situations in which a danger is to be apprehended. . . . The most usual situation today is the recall by automobile manufacturers of vehicles for corrective measures. No such claim is made here. [Emphasis in original; footnote and citation omitted.]

*See also Yakima Cement Products v. Great American Insurance Company,* 590 P.2d 371, 374–75 (Wash. Ct. App. 1979) : "Thus, the insurer is not liable for the cost of preventative or curative action taken by its insured. Instead, the insured must bear the cost of withdrawing a product from the market in situations in which a danger is apprehended although no accident has occurred. . . ." [Citation omitted.]

In the case before us, there was no product recall or preventative action taken by Paper Machinery or Nelson.[3] Paper Machinery simply replaced defective mandrels as they broke. Royal Globe's reliance on *Hamilton Die Cast v. United States Fidelity & Guaranty Co.,* 508 F.2d 417 (7th Cir. 1975), is misplaced. Although the sistership exclusion was given effect in that case, there was a blanket withdrawal of products from the market once defects were discovered. That did not occur in this case.

---

[3] Because we conclude that there was no product withdrawal in this case, we do not decide whether the exclusion applies to withdrawals by an insured's customer. *See Yakima Cement Products v. Great American Insurance Co.,* 590 P.2d 371, 375 n. 9 (Wash. Ct. App 1979).

## PROPERTY DAMAGE

Royal Globe seems to raise the issue of whether, regardless of the applicability of the sistership exclusion, there is any coverage for its insured in the first instance. The argument made is vague and inconclusive. If it is intended to contend that the policies in question do not apply because a claim for lost profits does not constitute "property damage" of the kind covered by the policies, we consider that issue waived by Royal Globe's conduct of the defense at trial. Unlike the prior issue which had never been addressed in Wisconsin, we decline to consider it on the merits.

Royal Globe had a contractual duty to defend Nelson against any suit seeking damages because of property damage and bodily injury, and assumed the defense of Nelson in this action. Royal Globe was also impleaded by Nelson and appeared at trial as third-party defendant.[4]

At trial, Royal Globe asserted no defense directed to Nelson or Paper Machinery, other than trying to determine whether the mandrels failed during the term of the policies. Royal Globe chose to employ the same counsel to defend both its own interests and those of its insured. As a result, it never put on a case of its own regarding whether property damage occurred. We will not entertain on appeal an issue which Royal Globe did not pursue at trial.

## HEARSAY

The trial court allowed, over defense objection, Paper Machinery's vice president to testify that beginning in

---

[4] Despite this, Royal Globe proceeded at trial with only one attorney representing both interests.

1975 Paper Machinery received complaints from customers that mandrels were failing while in use. Paper Machinery contended that the testimony was being offered not for the truth of the statements, but to show that Paper Machinery replaced mandrels because of customer complaints. The trial court received the testimony on that basis, but cautioned the jury that the testimony was being received only to show why Paper Machinery replaced the mandrels.

Royal Globe argues that this testimony was inadmissible hearsay, and that it was prejudiced because all three of Paper Machinery's experts were asked to assume that its customers had complained that mandrels failed while in use.

We conclude that the testimony was offered to prove the truth of the matter asserted—that customers complained of mandrel failure to Paper Machinery. Nonetheless, we believe its admission was harmless error for three reasons:

(1) The trial court instructed the jury of the limited use it could make of the testimony in a timely instruction;

(2) independent evidence of customer complaints was received in evidence without objection, including direct testimony by one of Paper Machinery's customers; and

(3) cracked and porous mandrels, returned by customers to substantiate their complaints of mandrel failure, were received in evidence.

### SURPRISE

Royal Globe claims surprise and prejudice because the trial court allowed testimony of Paper Machinery's economic expert witness who had not been named before trial. Whether an expert witness should be precluded

from testifying because of a party's failure to designate the expert in a timely fashion is a question committed to the sound discretion of the trial court. *Meurer v. ITT General Controls,* 90 Wis. 2d 438, 454–55, 280 N.W.2d 156, 163–65 (1979). A court cannot exercise discretion when no objection is made to admission of testimony, however. *See Bavarian Soccer Club v. Pierson,* 36 Wis. 2d 8, 15, 153 N.W.2d 1, 4 (1967). The record reflects that Royal Globe never objected at trial to this expert's testimony on the grounds now raised on appeal. Failure to make a timely objection constitutes waiver, sec. 901.03 (1) (a), Stats., and we will not address this issue for the first time on appeal.

We also note that the trial court expressed its willingness to allow Royal Globe to take depositions during time that otherwise would have been devoted to trial. Exclusion of a witness is a drastic remedy for claimed surprise, *Frederickson v. Louisville Ladder Co.,* 52 Wis. 2d 776, 784, 191 N.W.2d 193, 196 (1971), and a continuance is generally a more appropriate remedy. *State v. O'Connor,* 77 Wis. 2d 261, 287–88, 252 N.W.2d 671, 682 (1977). Had Royal Globe objected to this expert's appearance at trial, the record reflects that the trial court was able and willing to exercise its discretion to avoid the claimed prejudice of which Royal Globe now complains.

## FOUNDATION OF EXPERT'S OPINION

Royal Globe claims error because Paper Machinery's economic expert witness based his testimony on hearsay information of mandrel failures, given to him by Paper Machinery's president, attorneys, salesman, and customer. This claim is without merit for the reasons stated earlier where Royal Globe claimed prejudice because all

three of Paper Machinery's experts based their testimony on erroneously admitted hearsay. For reasons stated above, we find the receipt of the hearsay evidence to be harmless in the circumstance that other corroborative evidence was received into evidence.

## LOST PROFITS

Paper Machinery's economic expert witness testified that Paper Machinery suffered lost profits of more than two million dollars due to the failure of the defective mandrels supplied by Nelson. Royal Globe argues that the verdict of less than one million dollars cannot be sustained because the expert's opinion was based on speculation. We reject this argument.

Royal Globe claims speculation because the expert relied on financial reports and hearsay information in arriving at his opinion, and ignored other factors which could also have caused Paper Machinery's lost profits. We have twice commented on the harmless hearsay testimony, and also reject Royal Globe's contention that the expert ignored other possible causes. The record reflects that the expert considered and rejected other possible causes of Paper Machinery's lost profits, including:

(1) possible decrease of Paper Machinery's sales efforts;

(2) market saturation;

(3) the presence in the market of an aggressive German competitor; and

(4) declining general economic conditions.

We conclude that "[t]here was sufficient evidence before the jury from which it could estimate damages to the requisite degree of certainty." *Reiman Associates v. R/A Advertising,* 102 Wis. 2d 305, 324, 306 N.W.2d 292, 302 (Ct. App. 1981).

## SPECIAL VERDICT

Royal Globe argues that the trial court erred when it omitted from the special verdict a question whether Nelson's breach of warranties caused Paper Machinery's damages. "The trial court has considerable discretion in framing the special verdict and its decision will not be reversed on appeal if the material issues of fact are addressed." *Bridgkort Racquet Club v. University Bank*, 85 Wis. 2d 706, 712, 271 N.W.2d 165, 169 (Ct. App. 1978). We conclude that the trial court did not abuse its discretion in omitting a cause of damages question.

Royal Globe argues that absence of a cause of damages question could have allowed the jury to base its damage award for lost profits on factors other than the breach of warranties, and that the contract damage instructions do not negate the omission of the cause question.

Royal Globe has not satisfactorily explained to us how that unlikely circumstance might have occurred. We note that the damage question of the special verdict specifically requests the jury to determine damages that "result from" "the breach of warranty" it found in answer to the first question of the special verdict. The jury instructions repeatedly admonish the jury to determine the damages that resulted from the breach of warranty.

Royal Globe's first argument is answered by *Reiman Associates v. R/A Advertising, supra,* 102 Wis. 2d at 322, 306 N.W.2d at 301 (quoting 5 A. Corbin, *Corbin on Contracts* sec. 999 (1964)):

> In all cases involving problems of causation and responsibility for harm, a good many factors may have united in producing the result; the plaintiff's total injury may have been the result of many factors in addition to the defendant's tort or breach of contract. Must the defendant pay damages equivalent to the total harm suffered? Generally the answer is Yes, even though

there were contributing factors other than his own conduct. Must the plaintiff show the proportionate part played by the defendant's breach of contract among all the contributing factors causing the injury, and must his loss be segregated proportionately? To these questions the answer is generally No. [Footnote omitted.]

Although in *Reiman* we held that inclusion of the "a substantial factor" test in the contract breach special verdict was not error, we noted that this was because the trial court instructed the jury as to the doctrine of *Hadley v. Baxendale,* which limits the tort cause-in-fact component embraced by the "a substantial factor" test. *Id.* at 321 n. 11, 306 N.W.2d at 301 n. 11.

In the case before us, the trial court instructed the jury in accord with the doctrine of *Hadley v. Baxendale,* which limits the cause element. Royal Globe and Nelson were not prejudiced by the omission in the special verdict of a cause question, which would have emphasized the broader cause-in-fact without the *Hadley v. Baxendale* limitation.

## JUROR IMPARTIALITY

During the fourth day of trial, the trial court's bailiff informed the court that a juror had mentioned to him that she knew the daughter of the witness on the stand, but did not realize this until the witness gave his address. The trial court conducted a thorough *voir dire* examination of the juror, and allowed counsel to examine her.

Although the juror testified that the witness's daughter, who had married her son's best friend, had been a house guest, she also testified that she had not seen the daughter for four years. She had no contact with the witness, other than having been introduced to him ten years earlier at a "very large party." The juror assured the court and counsel that she had no feeling that this

association would influence her decision in the case, and that she had mentioned her association just because she felt "duty bound" to let the court know.

The trial court found the juror to be impartial and denied Royal Globe's motion for a mistrial. This ruling is committed to the sound discretion of the trial court, *Rodriguez v. Slattery*, 54 Wis. 2d 165, 169, 194 N.W.2d 817, 819 (1972), and we find no abuse of discretion. Royal Globe claims prejudice because it would have used one of its peremptory challenges to strike the juror had it known of the association during the initial *voir dire*. This argument is purely hypothetical, and ignores the reality of the circumstance where a juror recognizes a witness during trial. We agree with the trial court, which observed that in such a circumstance, it is sufficient for the court to determine whether the association will affect the juror's impartiality and the verdict. The record supports the trial court's discretionary ruling that the juror's impartiality and the verdict would not be affected, and we find no error.

## FAILURE TO GRANT CONTINUANCE

Nelson argues that the trial court abused its discretion when it failed to grant a continuance to allow Nelson to implead United States Fire Insurance Company (U.S. Fire). Nelson moved for a continuance because eight days before trial Royal Globe advised Nelson that recent discovery indicated that loss occurred after 1975 when U.S. Fire's policy was in effect.

We conclude that Nelson has failed to show why he should be relieved from the judgment in this case. Four and one-half years before the trial date Paper Machinery

had specifically requested policies of U.S. Fire, and the record reflects that U.S. Fire was informed of the claim. We note that Nelson brought a motion to preclude in the verdict any question of when damage occurred. At argument on the motion, Nelson stated that it felt that such a determination was immaterial to the lawsuit, and that insurance coverage should be decided later between Nelson and its insurers. This position does not support Nelson's argument on appeal that it was error for the trial court to deny its motion.

*By the Court.*—Judgments affirmed.