Gretchen G. Torres, Plaintiff-Appellant,

v.

Dean Health Plan, Inc., Defendant-Respondent.

Court of Appeals

*No. 2003AP3274. Submitted on briefs May 6, 2004. —Decided April 21, 2005.*

2005 WI App 89

(Also reported in 698 N.W.2d 107.)

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Jordan M. Lewis* and *Wood R. Foster, Jr.*, of *Siegel, Brill, Greupner, Duffy & Foster, P.A.*, Milwaukee, and *Victor C. Harding* of *Warshafsky, Rotter, Tarnoff, Reinhardt & Bloch, S.C.*, Milwaukee.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Richard L. Schmidt* and *Sarah A. Zylstra* of *Boardman, Suhr, Curry & Field, LLP*, Madison.

Before Deininger, P.J., Dykman and Lundsten, JJ.

¶ 1. LUNDSTEN, J. This is a subrogation dispute involving a health maintenance organization (HMO) and one of its enrollees. Dean Health Plan, Inc., is an HMO (Dean HMO). Gretchen Torres is a Dean HMO enrollee.

¶ 2. Torres was injured in an accident caused by a third-party tortfeasor. Dean HMO provided medical services to Torres that were covered by Torres's HMO contract with Dean. Torres negotiated a settlement with the tortfeasor. Dean HMO asserted a subrogation interest, and Torres paid Dean HMO $4,072.49 to "extinguish" that asserted subrogation interest. After paying Dean HMO, Torres sued Dean, arguing that Wisconsin statutes prohibit HMOs from exercising subrogation rights. Torres's argument is based on the fact that Dean is an HMO rather than a traditional non-HMO insurance company.

¶ 3. The circuit court granted Dean HMO's motion to dismiss for failure to state a claim. The court concluded that nothing in the statutes or case law prohibited Dean HMO's assertion of a contractual right to subrogation. The circuit court further concluded that

Dean's assertion of a subrogation right is consistent with subrogation law in Wisconsin. We agree and affirm.[1]

## *Background*

¶ 4. This is an appeal of a motion to dismiss for failure to state a claim. Thus, for purposes of this review, we accept as true the following facts from Torres's complaint:

- Torres is a Wisconsin resident and is an enrollee in a Dean HMO health plan.

- Dean HMO is a for-profit health maintenance organization.

- Torres was injured in an accident that gave rise to liability on the part of a third party.

- As part of the treatment for the injuries she suffered, Torres was treated by a variety of medical providers that are part of the Dean HMO network of providers.

- These medically necessary services provided to Torres were expressly covered under the Dean HMO health plan.

- Torres negotiated a settlement with the tortfeasor responsible for her injuries.

- Dean HMO asserted a "subrogation interest" in the "Torres action."

- Dean HMO agreed to accept, and subsequently was paid by Torres, $4,072.49 to "extinguish" its purported subrogation interest.

---

[1] Torres sought to represent all similarly situated current and former Dean HMO enrollees in a class action. Because we conclude that Torres's action was properly dismissed, there is no need to address the class action aspect of this case.

¶ 5. There are a few additional facts that we assume to be true because the parties themselves make that assumption for purposes of Dean HMO's motion to dismiss. We mention these facts when appropriate in our discussion section.

## *Discussion*

¶ 6. Torres argues that the circuit court erroneously dismissed her complaint for failure to state a claim. Our standard of review is well settled:

> A motion to dismiss a complaint for failure to state a claim upon which relief can be granted tests the legal sufficiency of the complaint. All facts pleaded and reasonable inferences that may be drawn from such facts are accepted as true, but only for purposes of testing the complaint's legal sufficiency. Nevertheless, legal inferences and unreasonable inferences need not be accepted as true. A complaint should not be dismissed as legally insufficient unless it appears certain that a plaintiff cannot recover under any circumstances.

*Beloit Liquidating Trust v. Grade*, 2004 WI 39, ¶ 17, 270 Wis. 2d 356, 677 N.W.2d 298 (citations omitted).

¶ 7. The underlying legal question requires that we construe statutes and apply them to undisputed facts. We recently summarized the applicable principles of statutory construction:

> When we are asked to construe a statute, we begin with the language of the statute and give it its common, ordinary, and accepted meaning, except that technical or specially defined words are given their technical or special definitions. We interpret statutory language in the context in which it is used, not in isolation, but as part of a whole, in relation to the language of surround-

ing or closely related statutes, and reasonably to avoid absurd or unreasonable results. We also consider the scope, context, and purpose of the statute insofar as they are ascertainable from the text and structure of the statute itself.

*Wisconsin Comm'r of Ins. v. Fiber Recovery, Inc.*, 2004 WI App 183, ¶ 16, 276 Wis. 2d 495, 687 N.W.2d 755 (citations omitted).

¶ 8. The central question in this case is whether WIS. STAT. §§ 609.01 and 609.91 (2003–04)[2] prohibit HMOs from asserting contractual subrogation rights with respect to actual medical expenses[3] incurred by an HMO for medical care covered by the HMO's contract with its enrollee. Torres, a Dean HMO enrollee, presents several arguments why HMOs may not exercise contractual subrogation rights and why, in this particular case, Dean HMO has no right of subrogation. We first address the arguments that apply to HMOs and enrollees generally, and then address Torres's fact-specific argument.[4]

---

[2] All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

[3] We use the phrase "actual medical expenses" to refer to the amount an HMO seeks to recover via subrogation for the expenses it incurs for medical services provided under an HMO contract. We use this phrase to make clear that we are not talking about the "reasonable value of medical services." *See Koffman v. Leichtfuss*, 2001 WI 111, ¶ 27, 246 Wis. 2d 31, 630 N.W.2d 201; *see also Paulson v. Allstate Ins. Co.*, 2003 WI 99, ¶ 30 n.5, 263 Wis. 2d 520, 665 N.W.2d 744 ("[T]oday the rule in Wisconsin is that a plaintiff is entitled to the reasonable value of the [medical] expenses paid, regardless of the actual payment.").

[4] "Subrogation may exist by operation of law, i.e., equitable subrogation, or may arise by contract of the parties, i.e. conventional subrogation." *Cunningham v. Metropolitan Life Ins.*

## A. Whether HMO Subrogation Rights Are Inconsistent with the Statutes Defining HMOs and Limiting Their Activities

### 1. The Statutes

¶ 9. Torres argues that Wis. Stat. §§ 609.01 and 609.91, working in combination, preclude HMOs from exercising contractual subrogation rights. She points to § 609.01(2), which defines an HMO as follows:

> *"Health maintenance organization" means a health care plan* offered by an organization established under ch. 185, 611, 613 or 614 or issued a certificate of authority under ch. 618 *that makes available to its enrollees, in consideration for predetermined periodic fixed payments, comprehensive health care services* performed by providers participating in the plan.

(Emphasis added.) Torres focuses on the language that we have italicized, that is, the language defining an HMO as an entity that provides health care services in consideration for "predetermined periodic fixed payments." Torres then points to § 609.91(3), which provides:

> DEDUCTIBLES, COPAYMENTS AND PREMIUMS. Subsections (1) to (2) do not affect the liability of an enrollee, policyholder or insured for any deductibles, copayments or premiums owed under the policy or certificate issued by the health maintenance organization insurer or by the insurer described in sub. (1m).

*Co.*, 121 Wis. 2d 437, 445, 360 N.W.2d 33 (1985). Torres argues that Dean HMO has no right to equitable subrogation because Dean HMO, not Torres, was primarily liable for the payment of medical expenses. We need not dwell on this argument because Dean HMO asserts that its subrogation right arises from contract, not from equity.

According to Torres, the interaction of these two statutes dictates that HMOs may not receive funds by the exercise of subrogation rights because this source of funds is not one of the three statutorily specified sources: premiums, copayments, or deductibles. The flaw in Torres's analysis is that the statutes she relies on do not limit the sources of funds available to HMOs to these three sources.

¶ 10. The definitional language Torres points to in Wis. Stat. § 609.01(2) simply says that an HMO is an entity "that makes available to its enrollees, in consideration for predetermined periodic fixed payments, comprehensive health care services." Subsection (2) of the statute does not put in place a general limitation on all sources of funds available to HMOs. The statutory language is plain as applied here; it does not even arguably state that HMOs may receive funds *only* in the form of "predetermined periodic fixed payments." Instead, this language differentiates HMOs from other traditional health care insurers by specifying, among other things, that HMOs must provide "comprehensive health care services" in return for "predetermined periodic fixed payments."

¶ 11. Adding Wis. Stat. § 609.91 to the mix does not help Torres. Nothing about the wording in that statute suggests that it is intended to more specifically limit all sources of funds available to HMOs. Section 609.91 does impose limits, but not any limits that conflict with an HMO's exercise of subrogation rights.

¶ 12. Rather than impose some sort of global limitation on all sources of funds available to HMOs, Wis. Stat. § 609.91 limits the liability of HMO *enrollees.* Section 609.91 prevents an HMO and its medical care providers from holding an enrollee liable for medical

services covered by the HMO's medical plan and provided by the HMO or one of its providers, except in specified circumstances. Pertinent provisions of the statute read:

**609.91 Restrictions on recovering health care costs. (1)** IMMUNITY OF ENROLLEES AND POLICYHOLDERS. Except as provided in sub. (1m), an enrollee or policyholder of a health maintenance organization insurer is not liable for health care costs that are incurred on or after January 1, 1990, and that are covered under a policy or certificate issued by the health maintenance organization insurer, if any of the following applies:

(a) The health care is provided by a provider who satisfies [specified statutory criteria].

. . . .

**(1m)** IMMUNITY OF MEDICAL ASSISTANCE RECIPIENTS. An enrollee, policyholder or insured under a policy issued by an insurer to the department of health and family services under s. 49.45(2)(b)2. to provide prepaid health care to medical assistance recipients is not liable for health care costs that are covered under the policy.

**(2)** PROHIBITED RECOVERY ATTEMPTS. No person may bill, charge, collect a deposit from, seek remuneration or compensation from, file or threaten to file with a credit reporting agency or have any recourse against an enrollee, policyholder or insured, or any person acting on their behalf, for health care costs for which the enrollee, policyholder or insured, or person acting on their behalf, is not liable under sub. (1) or (1m).

**(3)** DEDUCTIBLES, COPAYMENTS AND PREMIUMS. Subsections (1) to (2) do not affect the liability of an enrollee, policyholder or insured for any deductibles, copayments or premiums owed under the policy or certificate issued by the health maintenance organization insurer or by the insurer described in sub. (1m).

733

(4) CONDITIONS NOT AFFECTING THE IMMUNITY. The immunity of an enrollee, policyholder or insured for health care costs, to the extent of the immunity provided under this section and ss. 609.92 to 609.935, is not affected by [various conditions, such as an HMO breaching its agreement with a provider].

WIS. STAT. § 609.91. These provisions are written from the perspective of enrollees. They limit the personal liability of enrollees so that, if an enrollee receives medical services covered by an HMO's medical plan, the enrollee may not be held liable for the cost of such services, with specified exceptions, such as copayments. For example, subsec. (1) provides that "an *enrollee* . . . is not liable for health care costs . . . that are covered under a policy or certificate issued by [an HMO] insurer" (emphasis added). Similarly, subsec. (2) states that "[n]o person may . . . have any recourse against an *enrollee* . . . for health care costs for which the enrollee . . . is not liable [as specified by the legislature elsewhere in § 609.91]" (emphasis added). Subsection (4) specifies that the statutorily provided "immunity of an *enrollee* . . . for health care costs . . . is not affected by [various conditions, such as an HMO breaching its agreement with a provider]" (emphasis added).

¶ 13. Thus, WIS. STAT. § 609.91 is replete with language immunizing enrollees and limiting their liability. The statute does not speak to the sources of funds available to HMOs, except to the extent that it limits funds HMOs may obtain from enrollees.

██

¶ 14. Nonetheless, Torres argues that HMOs *are* collecting funds from enrollees when they enforce subrogation rights. We disagree.

¶ 15. We begin this part of our discussion with a clarification. Torres's argument does not implicate the

*Rimes* "make whole" doctrine. Torres does not argue that permitting subrogation in cases like hers prevents enrollees from being made whole. Torres does not assert that paying Dean HMO $4,072.49 to extinguish its subrogation right cut into money from the tortfeasor she needs to be "made whole." *See Rimes v. State Farm Mut. Auto. Ins. Co.*, 106 Wis. 2d 263, 272, 316 N.W.2d 348 (1982) (the "make whole" doctrine provides that "[s]ubrogation is to be allowed only when the insured is compensated in full by recovery from the tortfeasor. The insured is to be made whole, but no more than whole."). The specter of an HMO competing with an enrollee for a limited amount of funds from a tortfeasor is not raised by this case.

¶ 16. With this clarification in mind, we focus on Torres's argument that HMOs collect funds *from enrollees* when they enforce subrogation rights, in violation of enrollee liability limitations in Wis. Stat. § 609.91. We conclude that Torres's argument is based on a mischaracterization of the underlying subrogation transaction.

¶ 17. The supreme court explained the concept of subrogation in *Cunningham v. Metropolitan Life Insurance Co.*, 121 Wis. 2d 437, 360 N.W.2d 33 (1985). That explanation includes the proposition that one purpose of subrogation is to prevent the sort of double recovery Torres seeks here:

> The doctrine of subrogation, when applied in the insurance context, deals with the right of the insurer to be put in the position of the insured in order to pursue recovery from third parties, legally responsible to the insured, for a loss paid by the insurer to the insured. If the insured has been compensated in full by the insurer for the loss sustained, and subsequently

receives recovery from a third party, the insurer's right becomes a right to the proceeds if subrogation is found to apply.

The purpose of subrogation is to place the loss ultimately on the wrongdoers. It also prevents the insured from recouping a windfall double recovery.

*Id.* at 444 (citations omitted).[5] In *Koffman v. Leichtfuss*, 2001 WI 111, 246 Wis. 2d 31, 630 N.W.2d 201, the court reiterated that subrogation serves to prevent an insured from obtaining double recovery:

By virtue and to the extent of payments made on behalf of another, a subrogated party obtains a right of recovery in an action against a third-party tortfeasor and is a necessary party in an action against such a tortfeasor. Subrogation exists to ensure that the loss is ultimately placed upon the wrongdoer and to prevent the subrogor from being unjustly enriched through a double recovery, *i.e.,* a recovery from the subrogated party and the liable third party.

*Id.*, ¶ 33 (citations omitted).

¶ 18. Torres does not deny that, if HMOs are prohibited from exercising subrogation rights, HMO enrollees like her would get the sort of double recovery

---

[5] We are cognizant that *Cunningham* addresses equitable, not contractual, subrogation. *See Cunningham*, 121 Wis. 2d at 450–55. But, as Dean HMO points out, the purposes supporting subrogation, whether equitable or contractual, are the same. *See Ruckel v. Gassner*, 2002 WI 67, ¶ 26, 253 Wis. 2d 280, 646 N.W.2d 11 (" '[S]ubrogation is recognized or denied upon equitable principles without differentiation between "legal subrogation" which arises by application of principles of equity and "conventional subrogation" arising from contract or the acts of the parties.' " (quoting *Garrity v. Rural Mut. Ins. Co.*, 77 Wis. 2d 537, 543, 253 N.W.2d 512 (1977))); *see also Jindra v. Diederich Flooring*, 181 Wis. 2d 579, 604–05, 511 N.W.2d 855 (1994).

discussed in *Cunningham* and *Koffman*. Instead, Torres —apparently believing that the best defense is a good offense—asserts that it is HMOs that will get double recovery if subrogation is permitted. She contends that Dean HMO has collected twice for the same service: once in the form of premiums, and a second time in the form of tort recovery. But Torres is describing nothing more than the usual subrogation arrangement. Moreover, in *Cunningham*, the court explained that insurers do not necessarily retain the funds obtained through subrogation. Rather, competition may force these funds to be recycled in the form of lower rates:

> An additional purpose which underlies the doctrine of subrogation is that it prevents the policy holder from receiving more than he or she bargained for from the contract of insurance. Commentators in the field have suggested that if the insurer has only contracted to indemnify the insured for losses incurred, denying the insurer subrogation rights in effect rewrites the policy and allows the insured to retain benefits not contracted for. Other proponents of the subrogation doctrine assert that it returns the excess, duplicative proceeds to the insurer who can then recycle them in the form of lower insurance premiums.

*Cunningham*, 121 Wis. 2d at 445 (citations omitted). We are presented with no reason to think that the same reasoning does not apply to HMOs.

¶ 19. Finally, Torres argues that differences between HMOs and traditional insurers should persuade us to conclude that the legislature intended to treat HMOs differently for purposes of subrogation. For example, Torres says that HMOs, unlike traditional health care insurers, are created by statute. However, the fact that HMOs may be created by statute says nothing about whether HMOs may enforce contractual

subrogation rights. And, we have already rejected Torres's specific statutory arguments.

¶ 20. Another "difference" argument Torres proffers is based on a 1989 letter in which the Wisconsin Commissioner of Insurance states that HMOs combine elements of health insurance and health care delivery, and that HMOs transfer some of their insurance risks by contracts with health care providers that include fee limits and loss sharing.[6] Torres asserts that this risk-shifting, which she presumes is unavailable to traditional insurers, is central to the relationship between HMOs and health care providers and "bears directly on an HMO's right to subrogate." But so what if HMOs combine elements of health insurance and health care delivery? So what if HMOs bear less risk because they share risk with their providers? How do these differences tie in with contractual subrogation rights? There may be some connection, but Torres does not explain it, and none is apparent to us.

---

[6] A copy of the letter is part of the record in this case. The Commissioner of Insurance wrote:

> Health Maintenance Organizations (HMOs) differ from indemnity insurers in a number of ways. The most significant difference is that HMOs combine elements of health insurance and health care delivery. The HMO selects the providers of comprehensive health care services and directly pays those providers. Through the contractual agreements with providers, HMOs transfer some part of the insurance risk to providers. An important element of the operations of an HMO that differentiate[s] HMOs from indemnity health insurers is the extent that financial risk is assumed by providers. Financial risk is transferred from an HMO to providers through agreements which may include provisions for assessing providers, establishing capitated payments to providers, adjusting fee-for-service rates or sharing in the earnings or losses. This transfer of risk unique to HMOs is the basis for lower financial requirements for HMOs in comparison with indemnity insurers.

## 2. This Case Is Not Controlled by Dorr

¶ 21. Torres relies on *Dorr v. Sacred Heart Hospital*, 228 Wis. 2d 425, 597 N.W.2d 462 (Ct. App. 1999). Torres argues that, as a matter of law under *Dorr*, enrollees like her personally pay funds to HMOs. She contends that if HMOs have contractual subrogation rights, *Dorr* must have been wrongly decided. Torres states: "Under Dean's formulation, *Dorr* would be wrongly decided, because § 609.91 does not expressly limit payment 'only' to deductibles, copayments and premiums." She asserts that in *Dorr* we resolved the precise issue in this case because in *Dorr* we held that HMO enrollees are not liable for health care costs. None of Torres's *Dorr*-based arguments have merit.

¶ 22. The issue in *Dorr* was whether a non-HMO medical provider (Sacred Heart Hospital) could forgo its contractual right to payment from an HMO (Group Health) and instead file a hospital lien under Wis. Stat. § 779.80 against the HMO's enrollee. *Dorr*, 228 Wis. 2d at 430–31, 433–35. We held that the medical provider had no right to a lien against the HMO enrollee with respect to medical services covered by the enrollee's HMO plan because the enrollee owed no debt to the provider. *Id.* at 442, 444. Under the provider's agreement with the HMO, payment by the HMO constituted payment in full for covered services rendered by the provider to enrollees of the HMO. *Id.* at 433. Moreover, the enrollee owed no debt to the provider because of the protection from liability that Wis. Stat. § 609.91 affords HMO enrollees with respect to medical services covered by the enrollees' HMO medical plan. *Dorr*, 228 Wis. 2d at 442, 444.

¶ 23. Contrary to Torres's persistent assertion, a decision in favor of Dean HMO here does not make Torres, or similarly situated enrollees, "liable" for medi-

cal expenses. The question here is simply whether an HMO may have contractual subrogation rights that permits the HMO to recover its actual medical expenses. We agree with Dean HMO that *Dorr* says nothing about HMO subrogation rights.

### 3. *Torres's Misplaced Reliance on a Maryland Decision*

¶ 24. Torres relies heavily on a Maryland case, *Riemer v. Columbia Medical Plan, Inc.*, 747 A.2d 677 (Md. 2000). She goes so far as to structure her analysis of WIS. STAT. §§ 609.01 and 609.91 around this out-of-state decision. We agree with Torres that *Riemer*, in many pertinent respects, tracks the facts and statutes at issue in this case. We do not, however, find *Riemer* helpful or persuasive.

¶ 25. First, we agree with the circuit court that Wisconsin's statutory definition of an HMO is different from the Maryland definition at issue in *Riemer*. The Maryland statute defined HMOs, in pertinent part, as corporations that " '[e]xcept for any copayment or deductible arrangement, [are] compensated *only* on a predetermined periodic rate basis . . . .' " *Riemer*, 747 A.2d at 683–84 (emphasis added in *Riemer*) (quoting MD. CODE ANN., HEALTH—GEN. ARTICLE § 19–701(f)(3)). According to *Riemer*, the term "only" unambiguously means that a Maryland HMO cannot receive funds from a source apart from the three sources specified in § 19–701(f)(3). *Riemer*, 747 A.2d at 685–87. To interpret "only" otherwise, said the *Riemer* court, would be contrary to "the proper construction of the English language."[7] *Id.* at 686–87.

---

[7] We talk about the Maryland statute in the past tense because the Maryland legislature reacted to *Riemer v. Columbia*

¶ 26. The Wisconsin counterpart statute does not limit HMOs' sources of funds. Rather than saying that HMOs may receive only three types of funds, the Wisconsin statute defines an HMO as an entity "that makes available to its enrollees, in consideration for predetermined periodic fixed payments, comprehensive health care services." WIS. STAT. § 609.01(2). At most, this phrasing might be read as limiting payments from *enrollees* to "predetermined periodic fixed payments." The statutory language says nothing about funds from sources other than enrollees.

¶ 27. Torres argues that the absence of "only" in the Wisconsin statute is "too slender a reed to support" a different construction from the one reached by the *Riemer* court. But Wisconsin's statute does not merely omit "only," it fails to use any language defining HMOs as entities that may receive funds solely from identified sources.

¶ 28. We also observe that some of the reasons the *Riemer* court provides for its construction of the Maryland statute are based on unsupported assumptions. For example, the *Riemer* court asserts that it is "evident from the wording included throughout this [statute] that it was the intent of the Legislature to promote health care services, which were both affordable and efficient," and that this goal is furthered by a construction of the statutes that prohibits subrogation. *Riemer*, 747 A.2d at 688. But the *Riemer* court fails to explain why the absence of HMO subrogation contributes to affordability of HMO services. It is at least as likely that denying HMOs subrogation increases premiums for

---

*Medical Plan, Inc.*, 747 A.2d 677 (Md. 2000), by amending the Maryland statutes to expressly grant subrogation rights to HMOs. *See Dua v. Comcast Cable of Md., Inc.*, 805 A.2d 1061, 1067–68 (Md. 2002).

enrollees. *See Cunningham*, 121 Wis. 2d at 445 ("Other proponents of the subrogation doctrine assert that it returns the excess, duplicative proceeds to the insurer who can then recycle them in the form of lower insurance premiums.").

¶ 29. Another unsupported assumption in *Riemer* relates to its repeated references to HMOs seeking payment from enrollees. The *Riemer* court states:

> Section 19–710(h) requires a hold harmless clause in the contract between an HMO and its health care providers stating that a health care provider may not seek compensation, remuneration, or reimbursement from the member. Yet, in the case at bar, appellee seeks to do indirectly what providers cannot do directly. Because an HMO is a health care service, which is compensated "only" through a predetermined rate basis, copayment, or deductible arrangement, it stands to reason that the Legislature did not feel the need to address an HMO's right to pursue a member for payments for services already received: by the definition of an HMO, that type of reimbursement cannot occur.

*Riemer*, 747 A.2d at 689. This discussion wrongly assumes that subrogation somehow holds the enrollee liable for medical expenses. That assumption is demonstrably false. It is the tortfeasor who supplies the medical expenses money, not the enrollee. The enrollee pays not a penny more than if no tortfeasor and no subrogation were involved.

¶ 30. Finally, we question some of the "common sense" comparisons the *Riemer* court relies on. The *Riemer* court provides this reasoning:

> If a member prepays the HMO for health care and receives what he or she has already paid for, a service received from a health care provider and covered by the health care contract, and the HMO does not pay the

provider, the provider cannot then turn around and seek payment from the member. Under the same rationale, if a member prepays the HMO for health care and receives a service from a health care provider covered by the health care contract, and the HMO pays the provider, and then the member receives money from a third-party tortfeasor responsible for the injuries, the HMO cannot then seek payment from the member.

*Id.* at 689–90. The first sentence above is, essentially, a summary of our holding in *Dorr*. We explained in the previous section of this opinion why our holding in *Dorr* says nothing about whether HMOs have subrogation rights for actual medical expenses they incur when the target of subrogation is funds provided by a tortfeasor. Thus, in our view, the *Riemer* court uses faulty logic when it asserts that the "same rationale" supports its conclusion that an HMO may not recover medical expenses by way of subrogation.

¶ 31. For these reasons and others, we are not persuaded by Torres's reliance on *Riemer*.

### B. Torres's Fact-Specific Argument: Did Dean HMO Run Afoul of Wis. Stat. § 609.91 by Obtaining Money Directly from Torres?

■

¶ 32. An assertion of subrogation rights by an HMO may result in a tortfeasor paying medical expenses directly to the HMO. But here the complaint alleges that Dean HMO received the medical expenses money from Torres. The parties' arguments in the circuit court and in their briefs in this court make plain that it is undisputed that the parties construe the complaint as alleging that Dean HMO asserted its subrogation interest after Torres negotiated a settlement and received medical expenses money from the

743

tortfeasor. That is, the $4,072.49 Torres paid Dean HMO to "extinguish" Dean's subrogation interest was less than or equal to the amount of money the tortfeasor paid Torres for the medical expenses covered by Dean HMO.

¶ 33. Torres argues that the manner in which Dean HMO asserted its subrogation rights in this particular case conflicts with WIS. STAT. § 609.91 because here she *personally* paid the $4,072.49 to Dean HMO. Torres contends this payment was not permitted under the statute because it was not a premium, a copayment, or a deductible, the three permissible types of payments an HMO may obtain from an enrollee. *See* ¶¶ 9–13, *supra*. This argument ignores the substance of the transaction at issue.

¶ 34. Even assuming that Torres, as a factual matter, paid $4,072.49 to Dean HMO, she did not, in substance, pay that amount out of her own pocket. Torres was not poorer after receiving funds from the tortfeasor and remitting $4,072.49 to Dean HMO. Torres had received that amount or more for medical expenses, and her complaint does not assert that she had any uncovered expenses or other related damages of any type. *See* ¶ 15, *supra*. We agree with Dean HMO that it did not seek to hold Torres personally liable for medical expenses. Instead, Dean HMO merely asserted its contractual subrogation right to funds from the tortfeasor to offset expenses Dean HMO incurred to provide medical care to Torres.

### *Conclusion*

¶ 35. We agree with the circuit court that WIS. STAT. §§ 609.01 and 609.91 do not limit HMOs to receiving funds only from enrollees. Further, we con-

744

clude that, when an HMO exercises contractual subrogation rights, the HMO is not obtaining funds from an enrollee in violation of the enrollee's liability protections contained in § 609.91. It follows that the statutes do not prohibit HMOs from receiving funds by the exercise of contractual subrogation rights. Finally, we conclude that, even if Torres paid Dean HMO to satisfy Dean's right to subrogation, Torres was not held "liable" within the meaning of § 609.91, but instead merely passed along medical expenses money from the tortfeasor to Dean HMO.

¶ 36. All of Torres's claims in her complaint are based on the proposition that HMOs in general, and Dean HMO in particular, cannot exercise their rights to subrogation for the reasons Torres has argued. We have rejected Torres's arguments and have concluded that Dean HMO may exercise its contractual subrogation right here. Therefore, we affirm the circuit court's order dismissing Torres's complaint for failure to state a claim.

*By the Court.*—Order affirmed.